J-A29024-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE ESTATE OF RICHARD BREZENSKI, AN INCAPACITATED PERSON | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: RICHARD BREZENSKI | : : : : : | |
| | : | No. 1187 WDA 2020 |

Appeal from the Order Entered October 5, 2020
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  63-20-0395

BEFORE:  BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.*

MEMORANDUM BY BOWES, J.:                        **FILED:  January 13, 2022**

Richard Brezenski appeals from the October 5, 2020 order that decreed him an incapacitated person and appointed a plenary guardian of his person and estate.  We affirm.

This action was initiated when Mr. Brezenski's wife, Sandra Brezenski, filed a petition for adjudication of incapacity and appointment of guardian pursuant to 20 Pa.C.S. § 5511.  The orphans' court held several days of hearings on the petition.  In addition to her own testimony, Mrs. Brezenski presented the testimony of Mark Mamros, M.D., Mr. Brezenski's primary care physician, and Evgeniy Shchelchkov, M.D., a neurologist who treated Mr. Brezenski.  At the second hearing, Mr. Brezenski presented the testimony of Richard Ajayi, M.D., a psychiatrist who treated Mr. Brezenski, and Eric Weisman, M.D., a neurologist who examined Mr. Brezenski.  At the third

_____

 * Retired Senior Judge assigned to the Superior Court.

hearing, Mrs. Brezenski presented rebuttal testimony from Dr. Mamros and Connie McCord, Mr. and Mrs. Brezenski's daughter. At the fourth hearing, Mr. Brezenski testified. During the pendency of the hearings, the orphans' court ordered Mrs. McCord appointed as an emergency guardian for Mr. Brezenski.

Mrs. Brezenski testified that at the time of the hearing, she had been married to Mr. Brezenski for almost fifty years. N.T., 6/1/20, at 82. In 2018, Mr. Brezenski became forgetful, hostile, and demeaning, and he lost interest in his tinkering hobbies. *Id*. at 82-85. After being in the hospital in March 2019, he grew disoriented, angrier, and more aggressive. *Id*. at 87-88. He twice asked Mrs. Brezenski to bring him a gun to shoot the nurses and security guards at the hospital, and thereafter requested a gun to shoot the nurses at the nursing facility where he was moved. *Id*. at 88-89, 92. He also asked the nurses to go into the shower with him and flirted inappropriately with one of the nurses. *Id*. at 89-90.

Once Mr. Brezenski returned home, he remained forgetful, made inappropriate sexual comments towards Mrs. Brezenski, had to be reminded to shower and change his clothes, lost interest in things he had done before, would discard many of his medications instead of taking them, and began to search online for child pornography. *Id*. at 99-104. In early 2020, he choked Mrs. Brezenski. *Id*. at 106. Thereafter, in February 2020, he assaulted Mrs. Brezenski to prevent her from leaving the home with their joint checking account checkbook, chased her to her car, pounded his fist on the vehicle, and threatened to kill Mrs. Brezenski and her cat. The next day, Mrs. Brezenski

returned to the house with Mrs. McCord to get some personal items and her cat. As they were returning to their car, Mr. Brezenski arrived and blocked them in the driveway with his vehicle. After Mrs. Brezenski called the police, he moved his vehicle and she returned to Mrs. McCord's house. Shortly thereafter, Mr. Brezenski attempted to enter Mrs. McCord's house, threatened to kill them, and brandished what Mrs. Brezenski believed was a gun. Again, she called the police, who ultimately arrested Mr. Brezenski. *Id*. at 107-15. Mrs. Brezenski explained that she filed the petition for adjudication of incapacity in order to get her husband the help he needs and to transfer him to a memory care facility. *Id*. at 123-24.

Dr. Mamros testified as an expert, as well as Mr. Brezenski's primary care physician for the at least the past twenty-five years. *Id*. at 22. In Dr. Mamros's opinion, sometime within the prior two years, Mr. Brezenski was no longer able to make his own decisions and handle his own affairs as a result of suffering from frontal temporal lobe dementia, as well as several episodes of acute metabolic encephalopathy. *Id*. at 23, 25. As explained by Dr. Mamros, frontal temporal lobe dementia is a permanent, regressive disease with a slow progression involving "impulsivity and . . . a lack of judgment[.]" *Id*. at 23-24, 26, 40. During that time, Mr. Brezenski's normal baseline personality became very different: his language became hypersexual towards the hospital staff and, after suffering an episode of acute metabolic encephalopathy, his hypersexuality continued and he also became angry and paranoid. *Id*. at 25-26. As part of his paranoia, he had "typical delusions" of

his wife and daughter plotting against him and his wife cheating on him. *Id*. at 26. Based upon this diagnosis, Dr. Mamros believed that Mr. Brezenski required "some level of care where he can be assisted in [the] instrumental activities of daily living, [*i.e.*] . . . making sure he gets his medication, . . . help him with finances and shopping." *Id*. at 28.

Dr. Shchelchkov testified that he saw Mr. Brezenski five times. *Id*. at 57. Over the course of those visits, Dr. Shchelchkov came to the conclusion that Mr. Brezenski "probably suffer[ed] from early Alzheimer's disease." *Id*. at 59. Based upon Mr. Brezenski's behavioral issues and signs of mental status regression, Dr. Shchelchkov recommended that Dr. Mamros implement specific medications for the treatment of dementia and advised Mrs. Brezenski to confiscate his firearms. *Id*. at 62, 69. Unfortunately, because of other medical conditions, Dr. Shchelchkov was unable to evaluate whether Mr. Brezenski suffered from frontal temporal lobe dementia or another form of dementia. *Id*. at 63-65. Dr. Shchelchkov ultimately referred Mr. Brezenski to the Memory Clinic in the hope of identifying Mr. Brezenski's exact diagnosis. *Id*. at 71. Nonetheless, based on his evaluations, his "working diagnosis [wa]s . . . early onset dementia with behavioral problems." *Id*. at 73.

Dr. Ajayi testified as an expert, as well as a treating psychiatrist. Mr. Brezenski became a patient in his practice in February 2020, and Dr. Ajayi saw him five times between February and July 2020. N.T., 7/10/20, at 4-5, 7, 18-21. In his opinion, Mr. Brezenski does not have dementia, Alzheimer's, or diminished cognitive function, and he discontinued one of Mr. Brezenski's

medications. *Id*. at 15-16. In rebuttal, Dr. Mamros clarified that Dr. Ajayi relayed to him that he could not make an accurate assessment based solely on behaviors he observed on a "good day" during "the few minutes he got to spend with [Mr. Brezenski] during his evaluation." N.T., 7/24/20, at 7-9.

Dr. Weisman testified via telephone as an expert, as well as an examining neurologist. Dr. Shchelchkov referred Mr. Brezenski to Dr. Weisman to determine from what type of dementia Mr. Brezenski was suffering. N.T., 7/10/20, at 57. He conducted a single neurological examination of Mr. Brezenski on June 18, 2020, and later reviewed some of Mr. Brezenski's medical records. *Id*. at 54, 58, 65, 71-72. Based upon his examination and accompanying assessments, he concluded that Mr. Brezenski was not cognitively impaired. *Id*. at 61. As with Dr. Ajayi, he recommended removing some of Mr. Brezenski's current medications, including dextroamphetamine, which he referred to as "speed" and he blamed for Mr. Brezenski's homicidal and suicidal ideations. *Id*. at 63, 93. In the midst of cross-examination, Dr. Weisman abruptly terminated the telephone call and did not answer when the court attempted to call him. *Id*. at 98, 100-01.

In rebuttal, Dr. Mamros testified that Dr. Weisman's "one-time visit" did not change Dr. Mamros's opinion as to Mr. Brezenski's incapacity because it was only a "snapshot" with "his whole source of information [coming from] Mr. Brezenski himself." N.T., 7/24/20, at 12. He also disagreed with Dr. Weisman's conclusion that Mr. Brezenski's dextroamphetamine prescription, or Adderall, caused any violent behavior as he has been continuously taking

that medication to treat narcolepsy for over thirty years and therefore it could not be an explanation for a change in behavior. *Id*. at 32-36.

Mrs. McCord testified as to her efforts to address Mr. Brezenski's financial and health affairs since being appointed as his emergency guardian. N.T., 7/24/20, at 40-77. She also testified to threats that Mr. Brezenski made against his own life and that of her family in response to her attempts to carry out her emergency guardianship duties. *Id*. at 75-76.

Finally, Mr. Brezenski testified to his ability to manage his own financial and health affairs, as well as to his own version of some of the abovementioned events. N.T., 8/13/20, at 4-80.

After the hearings, the orphans' court took the matter under advisement. The orphans' court ultimately did not find the testimony of either Dr. Ajayi nor Dr. Weisman to be persuasive or credible. Orphans' Court Opinion, 5/28/21, at 5. By order filed October 5, 2020, the court found clear and convincing evidence that Mr. Brezenski suffers from frontal temporal lobe dementia and is incapable of caring for himself and making decisions regarding his daily living activities and affairs. Order, 10/5/20, at 1-2. Therefore, the court appointed Mrs. McCord as plenary guardian of Mr. Brezenski's person and estate.

This timely appeal followed. Both Mr. Brezenski and the orphans' court have complied with Pa.R.A.P. 1925. On appeal, Mr. Brezenski raises the following issues:

1. Whether the trial court abused its discretion and committed an error of law in determining that Appellant is incapacitated and that a guardian must be appointed.

2. Whether the trial court abused its discretion by failing to consider the expert witness testimony presented by Appellant and the testimony of the Appellant that he was able to evaluate information effectively and communicate decisions in any way so as to be able to manage his financial resources and meet the essential requirements for his physical health and safety.

3. Whether the trial court abused its discretion and committed an error of law in finding that Appellant suffered from a mental illness or condition requiring the appointment of a guardian.

Mr. Brezenski's brief at 3 (unnecessary capitalization omitted).

Mr. Brezenski's claims challenge the orphans' court's finding of incapacity and subsequent appointment of a guardian.

The appointment of a guardian lies within the discretion of the trial court and will be overturned only upon an abuse of discretion. Discretion must be exercised on the foundation of reason. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will.

*In re Duran*, 769 A.2d 497, 506 (Pa.Super. 2001) (cleaned up).

Our legislature has provided that, upon clear and convincing evidence of incapacity, an orphans' court may appoint a guardian of the person and/or estate. *See* 20 Pa.C.S. § 5511(a). An incapacitated person is "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S. § 5501.

The legislature has enumerated the following specific considerations and findings necessary to the resolution of a guardianship petition by an orphans' court:

> **(a) Determination of incapacity.**--In all cases, the court shall consider and make specific findings of fact concerning:
>
>> (1) The nature of any condition or disability which impairs the individual's capacity to make and communicate decisions.
>>
>> (2) The extent of the individual's capacity to make and communicate decisions.
>>
>> (3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in light of the existence, if any, of advance directives such as durable powers of attorney or trusts.
>>
>> (4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.
>>
>> (5) The duration of the guardianship.
>>
>> (6) The court shall prefer limited guardianship.
>>
>> . . . .
>
> **(c) Plenary guardian of the person.**--The court may appoint a plenary guardian of the person only upon a finding that the person is totally incapacitated and in need of plenary guardianship services.
>
>> . . . .
>
> **(e) Plenary guardian of the estate.**--A court may appoint a plenary guardian of the estate only upon a finding that the person is totally incapacitated and in need of plenary guardianship services.

20 Pa.C.S. § 5512.1.

After reviewing the certified record and the parties' briefs, we discern no error or abuse of discretion on the part of the orphans' court as to the issues raised by Mr. Brezenski. Specifically, the orphans' court noted that: (1) the court found Mr. Brezenski was suffering from a decline in his mental health that rendered him incapacitated based on the testimony of Dr. Mamros, Dr. Shchelchkov, and Mrs. Brezenski; (2) the court reviewed all the evidence and transcripts of the proceedings, considered the testimony of all the experts and Mr. Brezenski, and, as the fact-finder, concluded that "Dr. Mamros and Shchelchkov provided significant testimony that Mr. Brezenski was suffering from frontal lobe dementia and early onset Alzheimer's and that he was incapacitated, necessitating the appointment of a guardian[,]" Dr. Mamros was the most familiar with Mr. Brezenski and was unequivocal in his medical opinion, and Dr. Ajayi's testimony, Dr. Weisman's testimony, and Mr. Brezenski's testimony were not persuasive or sufficient to overcome the expert findings of Dr. Mamros and Dr. Shchelchkov;[1] and (3) the court found

_____

[1] Specifically, the orphans' court found Dr. Ajayi's opinion that Mr. Brezenski was not suffering from dementia "was discredited when he admitted that Mr. Brezenski's paranoia regarding his family could be related to a disease process such as dementia" and he was unaware of Mr. Brezenski's suicidal and homicidal ideations and behavioral changes, and therefore could not opine on whether those behaviors were related to dementia. Orphans' Court Opinion, 5/28/21, at 11. Likewise, the court found Dr. Weisman's opinion that Mr. Brezenski was not suffering from dementia was discredited for multiple reasons, including failing to conduct a complete assessment or review all information necessary to complete an accurate assessment, accepting as fact

that Mr. Brezenski's third allegation was nearly identical to his first, and that based upon the testimony of Dr. Mamros and Dr. Shchelchkov, Mr. Brezenski was incapacitated and in need of a guardian. **See** Orphans' Court Opinion, 5/28/21, at 9-16. Accordingly, we affirm the order on the basis of the cogent and well-reasoned opinion that Honorable John F. DiSalle entered on May 28, 2021.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Joseph D. Seletyn, Esq.
Prothonotary

Date:  01/13/2022

---

Mr. Brezenski's medical statements but failing to investigate the claims regarding his personality and disregarding them in his evaluation, failing to notice Mr. Brezenski was suffering from cellulitis to the degree that he was hospitalized immediately after the appointment, despite conducting a general examination and being with Mr. Brezenski for over an hour, and "act[ing] in an unprofessional manner during his telephone testimony[.]" **Id**. at 11-13.